NO. 24-2103

In The

# United States Court Of Appeals For The Fourth Circuit

## SABARA FISHER ROBERTS, individually and as administrator of the estate of Adrian Roberts,

*Plaintiff – Appellee,*

v.

## DEPUTY J. EVANS,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALEIGH

————————

**BRIEF OF APPELLANT**

————————

**Reginald B. Gillespie, Jr.**
**WILSON RATLEDGE, PLLC**
**4600 Marriott Drive**
**Suite 400**
**Raleigh, NC  27612**
**(919) 787-7711**

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street  ♦  P.O. Box 1460 (23218)  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-2103    Caption: Sabara Roberts v. Deputy J. Evans

Pursuant to FRAP 26.1 and Local Rule 26.1,

Appellant Deputy J. Evans, who is an individual/natural person, not an entity
(name of party/amicus)

_____

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:
      Not Applicable.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:
      Not Applicable.

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:

      Not Applicable.

5.    Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:

      Not Applicable.

6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.

      Not Applicable.

7.    Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.

      Not Applicable.

Signature: /s/ Reginald B. Gillespie, Jr.                    Date:    November 15, 2024

Counsel for: Appellant Deputy J. Evans

Print to PDF for Filing

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

JURISDICTIONAL STATEMENT ....................................................... 2

QUALIFIED IMMUNITY ISSUE PRESENTED FOR REVIEW ............ 2

STATEMENT OF THE FACTS ........................................................... 3

SUMMARY OF ARGUMENT ........................................................... 12

ARGUMENT ................................................................................. 13

    I.    STANDARD OF REVIEW ..................................................... 13

    II.    JUSTIN IS ENTITLED TO QUALIFIED IMMUNITY
         BECAUSE HE DID NOT VIOLATE ROBERTS'S
         CONSTITUTIONAL RIGHTS, AS HIS USE OF FORCE
         WAS OBJECTIVELY REASONABLE ................................... 15

         A.    CLAIMS OF EXCESSIVE FORCE ARE
              ANALYZED UNDER A REASONABLENESS
              STANDARD ................................................. 15

         B.    JUSTIN'S ACTIONS WERE OBJECTIVELY
              REASONABLE IN LIGHT OF THE FACTS AND
              CIRCUMSTANCES CONFRONTING HIM. ............... 16

    III.    JUSTIN IS ENTITLED TO QUALIFIED IMMUNITY
         BECAUSE HE DID NOT VIOLATE A CLEARLY
         ESTABLISHED RIGHT OF ROBERTS OF WHICH A
         REASONABLE LAW ENFORCEMENT OFFICER
         WOULD HAVE KNOWN ....................................................... 24

i

IV.    THERE WERE NO UNRESOLVED FACTUAL ISSUES THAT PRECLUDE THIS APPEAL OR QUALIFIED IMMUNITY ........................................................................... 35

CONCLUSION ........................................................................... 46

CERTIFICATE OF COMPLIANCE ....................................................... 49

## <u>TABLE OF AUTHORITIES</u>

**Page(s):**

**Cases:**

*Aleman v. City of Charlotte,*
    80 F.4th 264 (4th Cir. 2023)....................................................... 14, 27

*Anderson v. Creighton,*
    483 U.S. 635 (1987) ........................................................................ 24

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ........................................................................ 36

*Anderson v. Russell,*
    247 F.3d 125 (4th Cir.), *cert. denied,*
    534 U.S. 949 (2001) ...................................................... 19, 43, 44, 45

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011) ................................................................. 25, 34

*Betton v. Belue,*
    942 F.3d 184 (4th Cir. 2019) .......................................................... 18

*Buonocore v. Harris,*
    65 F.3d 347 (4th Cir. 1995) ............................................................ 25

*Caraway v. City of Pineville,*
    111 F.4th 369 (4th Cir. 2024)................................................. *passim*

*City and Cnty. of San Francisco v. Sheeran,*
    575 U.S. 600 (2015) ........................................................................ 26

*Cohen v. Beneficial Indus. Loan Corp.,*
    337 U.S. 541 (1949) .......................................................................... 2

*Cooper v. Sheehan,*
    735 F.3d 153 (4th Cir. 2013) .......................................................... 33

iii

*Dunbar v. Lindsey*,
  905 F.2d 754 (4th Cir. 1990) ........................................................ 27

*Durham v. Jones*,
  737 F.3d 291 (4th Cir. 2013) ........................................................ 13

*Elliott v. Leavitt*,
  99 F.3d 640 (4th Cir. 1996) ........................................ 17, 18, 20, 28

*Ford v. Childers,*
  855 F.2d 1271 (7th Cir. 1988) ...................................................... 19

*Franklin v. Popovich*,
  111 F.4th 1188 (11th Cir. 2024) ................................................... 35

*Graham v. Connor*,
  490 U.S. 389 (1989) ............................................................ *passim*

*Greenidge v. Ruffin*,
  927 F.2d 789 (4th Cir. 1991) ........................................................ 19

*Harris-Billups on behalf of Harris v. Anderson*,
  61 F.4th 1298 (11th Cir. 2023) ..................................................... 34

*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ..................................................................... 25

*Hope v. Pelzer*,
  536 U.S. 730 (2002) ..................................................................... 25

*Hunter v. Bryant*,
  502 U.S. 224 (1991) ...................................................... 24, 28, 36

*Jackson v. Long*,
  102 F.3d 722 (4th Cir. 1996) .................................................. 26, 27

*Johnson v. Caudill*,
  475 F.3d 645 (4th Cir. 2007) .................................................. 24, 27

iv

*Kisela v. Hughes,*
    584 U.S. 100 (2018) ..................................................... 26

*Lassiter v. Alabama A&M Univ.,*
    28 F.3d 1146 (11th Cir. 1994) ..................................... 28

*Maciariello v. Sumner,*
    973 F.2d 295 (4th Cir. 1992), *cert. denied,*
    506 U.S. 1080 (1993) ................................................... 27

*Malley v. Briggs,*
    475 U.S. 335 (1986) ..................................................... 28

*McLenagan v. Karnes,*
    27 F.3d 1002 (4th Cir. 1994) ....................................... 29

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) ....................................................... 2

*Mullenix v. Luna,*
    577 U.S. 7 (2015) ....................................... 16, 17, 26

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ..................................................... 24

*Pollard v. City of Columbus, Ohio,*
    780 F.3d 395 (6th Cir. 2015), *cert. denied,*
    577 U.S. 872 (2015) ..................................................... 32

*Rambert v. City of Greenville,*
    107 F.4th 388 (4th Cir. 2024) ....................................... 2

*Reese v. Anderson,*
    926 F.2d 494 (5th Cir. 1991) ....................................... 29

*Reichle v. Howards,*
    566 U.S. 658 (2012) ............................................... 25, 34

*Saucier v. Katz,*
    533 U.S. 194 (2001) ..................................................... 27

*Scott v. Harris,*
    550 U.S. 372 (2007) .......................................................... 14, 18, 36

*Sherrod v. Berry,*
    856 F.2d 802 (7th Cir. 1988) ...................................................19-20

*Sigman v. Chapel Hill,*
    161 F.3d 782 (4th Cir. 1998) ...................................................44, 45

*Slattery v. Rizzo,*
    939 F.2d 213 (4th Cir. 1991) ...................................................28, 46

*Tarantino v. Baker,*
    825 F.2d 772 (4th Cir. 1987) ..........................................................25

*Tennessee v. Garner,*
    471 U.S. 1 (1985) ...............................................................18, 23, 33

*Waller v. City of Danville,*
    212 Fed. Appx. 162 (4th Cir. 2006)............................. 41, 42, 43, 45

*Willingham v. Crooke,*
    412 F.3d 553 (4th Cir. 2005) ...............................................14, 35, 36

*Wilson v. Layne,*
    141 F.3d 111 (4th Cir. 1998), *aff'd*, 526 U.S. 603 (1999) .........25, 34

*Wilson v. Meeks,*
    52 F.3d 1547 (10th Cir. 1995) .........................................................32

**Statutes:**

28 U.S.C. § 1291.................................................................................2

28 U.S.C. § 1331.................................................................................2

42 U.S.C. § 1983............................................................................ *passim*

**Constitutional Provisions:**

U.S. Const. amend. IV ........................................................ *passim*

**Rules:**

E.D.N.C. Loc. Civ. R. 56.1(a)(1) ................................................ 37

E.D.N.C. Loc. Civ. R. 56.1(a)(2) ............................................... 37

## **<u>INTRODUCTION</u>**

Cumberland County Sheriff's Office ("CCSO") Deputies attempted to take Adrian Roberts ("Roberts") into custody on August 18, 2020, as directed in a properly issued order for Roberts's involuntary commitment (the "IVC Order").  Unfortunately, Roberts

> attempted to kill or cause serious bodily injury to the officers serving the involuntary commitment petition and order, and as a result the officers responded, resulting in the death of [Roberts].

(JA179.)  Plaintiff-Appellee Sabara Roberts ("Plaintiff"), Roberts's wife, admits the truth of the foregoing.  She testified in her deposition as follows:

> Q.    [D]o you have any evidence that this statement is not correct?
>
> A.    I don't have any evidence, no.

(JA174:10-14.)  These uncontroverted material facts, without more, demonstrate that Defendant-Appellant Deputy Justin Evans ("Justin"), who responded to Roberts's attempt to kill or seriously injure the Deputies by shooting Roberts, is entitled to qualified immunity.

But there is more, much more, as the record shows and as explained below.

1

## JURISDICTIONAL STATEMENT

Plaintiff commenced this action in the United States District Court for the Eastern District of North Carolina, asserting claims under 42 U.S.C. § 1983. (JA7-30.) The district court had jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

Justin moved for summary judgment based on qualified immunity. (JA561-573.) In an order entered September 30, 2024, the district court denied Justin's motion. (JA59-84.)

On October 25, 2024, Justin timely gave notice of appeal from the district court's order. (JA85-87.) Although the district court's order is interlocutory, this Court has jurisdiction of Justin's appeal pursuant to 28 U.S.C. § 1291 and under the collateral order doctrine. *See Mitchell v. Forsyth*, 472 U.S. 511, 512 (1985); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949); *Rambert v. City of Greenville*, 107 F.4th 388, 396-97 (4th Cir. 2024).

## QUALIFIED IMMUNITY ISSUE PRESENTED FOR REVIEW

WHERE THE UNCONTRADICTED FACTS SHOW THAT A SHERIFF'S DEPUTY, WHO WAS FACING A MENTALLY ILL MAN, WHOM THE DEPUTY AND OTHER SHERIFF'S DEPUTIES WERE ATTEMPTING TO TAKE INTO CUSTODY PURSUANT TO A COURT ORDER FINDING THAT THE MAN WAS A DANGER TO HIMSELF AND OTHERS, AND WHOM THE DEPUTIES SAW AND KNEW TO BE

ARMED WITH MACHETES AND KNIVES AND WAS IN THE ACT OF ATTEMPTING TO USE A MACHETE AGAINST THE DEPUTIES, IN THESE TENSE, UNCERTAIN, AND RAPIDLY EVOLVING CIRCUMSTANCES, DID THE DISTRICT COURT ERR IN DENYING THE DEPUTY'S MOTION FOR SUMMARY JUDGMENT, PREMISED ON QUALIFIED IMMUNITY, FROM AN EXCESSIVE FORCE CLAIM UNDER 42 U.S.C. § 1983?

## STATEMENT OF THE FACTS

Shortly after 10:00 AM on August 18, 2020, Tamikco Bethea, a mental health care professional, went to Roberts's house at 3932 Summerfield Lane, Fayetteville, North Carolina to conduct a mental health wellness check on Roberts.  (JA535.)  Ms. Bethea was employed by Therapeutic Alternative Mobile Crisis, commonly referred to as mobile crisis management, to assist persons in mental health crises.  (*Id.*)

CCSO Deputies Dennis Doody and Jessica Jones accompanied Ms. Bethea.  (JA184:15-20, JA184:24-185:3.)  According to Ms. Bethea, Roberts was extremely paranoid and threatening, believing the state and federal governments were spying on and planning to attack him and that neighborhood children were disguised assassins.  (JA536-538.)  Ms. Bethea informed the Deputies that Roberts was apparently in a mental health crisis, was not taking his medications, was schizophrenic, bipolar, and in a state of paranoia.  (JA185:22-25.)  Ms. Bethea stated that

Plaintiff had reported that Roberts had machetes, knives, and daggers in his residence and that he kept them all within hand's reach. (JA536.)

As the CCSO Deputies approached Roberts's house, with Ms. Bethea following behind them, Roberts opened a window and yelled at them to stop. (JA186:10-13.) He told them he did not want them on his property. (*Id*.) Roberts said, "Why are y'all here, I didn't call y'all, I'm fine," and "Y'all can leave." (JA536.) The Deputies informed Roberts that Ms. Bethea was there to help him. (JA186:13-17.)

Roberts became aggressive and made sexually aggressive comments to Ms. Bethea. (JA191:22-192:2, JA198:17-199:2.) Ms. Bethea then indicated she had done what she could as a mental health worker and was leaving. (JA187:1-5, JA198:17-199:2.) Even though Ms. Bethea felt protected by being with the Deputies, Roberts frightened her and she had "chills from the bottom of her feet" because Roberts "really seemed like he was out of it, like crazy." (JA536.)

The Deputies, who were trained in Crisis Intervention Technique, attempted to de-escalate the situation. (JA182:19-183:3, JA186:13-21.) They were unable to persuade Roberts to accept mental health assistance, and departed when Roberts ordered them off his property.

4

(JA536.)  As the Deputies were departing, Roberts came outside of the house and appeared to be recording them as they were leaving.  (JA192:8-14.)

Ms. Bethea called Plaintiff and informed her that Roberts did not want help and had refused assistance.  Plaintiff told Ms. Bethea that Roberts had been diagnosed with post-traumatic stress disorder and schizoaffective disorder.  (JA537.)  Plaintiff said she was afraid of Roberts.  (JA270:7-9.) Ms. Bethea explained the process for obtaining an involuntary commitment order for Roberts, which Plaintiff had done twice before.  (JA145:25-146:2, JA147:10-19, JA148:6-14, JA161:5-11.)

That afternoon, The Honorable John Briggs, a Magistrate of the North Carolina General Court of Justice, received the following sworn testimony from Plaintiff, which he considered and relied on in granting Plaintiff's petition for involuntary commitment ("IVC Petition"):

> VETERAN SUFFERING FROM EXTREME PTSD AND SCHITZO EFFECTIVE DISORDER. PARANOID THAT GOVERNMENT OFFICIALS (NC SBI) IS MONITORING HIM AND HAS HAD RECENT ALTERCATIONS WITH LAW ENOFRCEMENT DISPATHCED FOR WELLNESS CHECKS. DUE TO PARANOIA HE IS ARMING HIMSELF WITH THROWING KNIVES, MACE AND A MACHETE, WHICH HE KEEPS BY HIS SIDE EVEN WHEN HE

5

SLEEPS AND SHOWERS. WIFE FEARS FOR HER
AND THE CHILDREN'S SAFETY.

(JA177) (emphasis by capital letters in original IVC Petition).

Subsequently, Plaintiff reaffirmed these facts and **Plaintiff testified in**

**her deposition that the facts stated in her IVC Petition were true**.

(JA166:7-18.)

Based on the testimony from Plaintiff's sworn IVC Petition,

Magistrate Briggs issued the IVC Order, finding that:

> The Court finds from the petition . . . that there are
> reasonable grounds to believe that the facts alleged in
> the petition are true and that the respondent [*i.e.*,
> Roberts] probably . . . has a mental illness and is
> dangerous to self or others or has a mental illness and
> is in need of treatment in order to prevent further
> disability or deterioration that would predictably result
> in dangerousness.

(JA177.)     **In her deposition, Plaintiff also confirmed the**

**magistrate's findings as true.** (JA166:23-167:11.)

The IVC Order directed "ANY LAW ENFORCEMENT OFFICER"

to take Roberts into custody "**WITHIN 24 HOURS**" and transport him

for examination. (JA179.) The IVC Order and the IVC Petition were

delivered to the CCSO, where Captain Charles Parker ("Captain

Parker"), who was responsible for serving such orders pursuant to CCSO

6

policy, read the IVC Order (JA179-180) and the IVC Petition (JA177-178), and assumed responsibility for serving the documents on Roberts and taking him into custody for a mental health examination. (JA251:22-252:8.)

Captain Parker telephoned Plaintiff, and Plaintiff informed Parker that she was afraid Roberts would harm her and her children. (JA252:19-253:1, JA270:7-21.) In addition, CCSO Deputies acquired information that Roberts had committed a robbery, which ended with a high-speed chase involving law enforcement, and he had committed domestic violence assaults. (JA257:3-8, JA298:16-299:2.) Also, a Deputy who was familiar with Roberts reported that Roberts was very violent toward law enforcement, and that multiple Deputies could be required to serve the IVC Order and the IVC Petition and to take Roberts into custody. (JA303-304 ¶7, JA304 ¶10.)

Accordingly, Captain Parker tasked the Deputies who had attempted to resolve the issues with Roberts earlier that day -- Deputy Doody and Deputy Jones -- with attempting to persuade Roberts to come out of his house as he had before, accept assistance, and receive treatment, as well as to de-escalate the situation. (JA259:3-19.) Also,

7

Captain Parker, having consulted with and obtained approval of the CCSO Command Staff, directed the CCSO Special Response Team (the "SRT")[1] to provide assistance, if needed, in taking Roberts into custody. (JA258:2-10, JA271:2-272:3.)

The SRT developed a plan under which Captain Parker, Deputy Doody, and Deputy Jones would return to Roberts's house and attempt to obtain Roberts's voluntary exit from his house so that he could be taken into custody outside, thereby avoiding the greater risk of a forcible entry.[2] (JA190:9-22, JA204:12-14, JA242:15-22, JA255:6-13, JA259:6-19, JA262:8-263:4, JA282:4-18, JA283:15-23, JA294:20-295:1.)

Captain Parker, Deputy Doody, and Deputy Jones went to Roberts's house and approached the same window through which the two Deputies and Ms. Bethea spoke with Roberts that morning, while the SRT gathered out of sight along an outside wall. (JA191:8-13, JA261:3-6.) When Captain Parker explained to Roberts that he and the two Deputies

---

[1] SRT members were well-trained, having received, among other things, Crisis Intervention Training and were certified in Crisis Intervention Technique, and had received refresher and advanced training. (JA248:15-249:21, JA292:4-293:2.)

[2] When Roberts came outside that morning as Ms. Bethea and the Deputies were leaving, he was observed to be video recording them and was not seen with weapons at that time. (JA192:8-14.)

8

were there for a wellness check and to help him, and asked him to come outside and talk, Roberts became irate, refused to come outside, and ordered them to leave. (JA191:15-18, JA261:6-9, JA261:12-25.)

Captain Parker, Deputy Doody, and Deputy Jones went to their patrol cars and drove not far away, so as to give the appearance of leaving the area, in an attempt to induce Roberts to come outside without weapons, as he had done that morning. (JA190:18-22, JA192:8-14, JA193:4-9, JA262:20-263:4.)

Roberts did not come outside. Captain Parker contacted his superior, CCSO Major Dennis Peterson, who authorized the SRT to make entry. (JA263:11-12.)

Captain Parker ordered the SRT to prepare to make entry by coming around from the side of Roberts's house and assembling in their established manner (often called a stack) at the front door and to be ready to breach the door if Roberts did not come outside. (JA229:10-20, JA263:5-17, JA264:21-265:4.) Meanwhile, Captain Parker, Deputy Doody, and Deputy Jones returned to Roberts's house to make a final attempt to persuade him to come outside. (JA263:13-21.) Returning to the same window as before, Captain Parker told Roberts they had a court

9

order to serve on him, and asked him to come outside and get it taken care of, and told Roberts everything would be fine. (JA263:17-21, JA264:21-22, JA265:3-6.) Roberts again refused to come outside, becoming more agitated. (JA263:17-21, JA264:21-22, JA265:3-6.)

After refusing for 45 minutes to an hour to come outside to be taken into custody, Roberts appeared to be preparing to attack the Deputies. (JA204:2-4, JA264:13-20.) Seeing Roberts apparently distracted and walking away from the front door and toward the kitchen, Captain Parker ordered the SRT to make entry. (JA265:7-10.) When Corporal Luis A. Fermin ("Corporal Fermin") struck the door with a breaching tool, Captain Parker saw Roberts suddenly turn around and run toward the door with his right arm up and an object in his right hand, which Captain Parker saw as attacking them with what he believed was a dangerous weapon. (JA266:22-267:21.)

The door did not open with the first strike of the breaching tool. (JA204:21-205:4, JA215:7-9, JA284:18-20.) As the door burst open upon the second strike, Deputies saw Roberts advancing toward them, with a machete in his right hand raised above his head, preparing to strike in an attempt to cause serious and potentially fatal injuries. (JA205:5-17,

JA210:21-211:20, JA215:11-23, JA217:5-8, JA226:2-15, JA235:5-23, JA266:22-267:21, JA267:24-268:9, JA276:12-277:12.)

Justin, who had taken the point position at the front of the stack, recognized the grave risk and danger to himself and Corporal Fermin. (JA211:15-20, JA213:4-6, JA213:22-25, JA215:11-16, JA287:21-288:8.) As the breacher, Corporal Fermin was the most vulnerable member of the team, because had no weapon in hand to defend himself. (*Id.*)

Almost immediately Justin discharged his weapon, striking Roberts with three shots, and eliminating the deadly risk Roberts posed to Corporal Fermin and Justin. (JA195:20-196:2, JA205:5-17, JA210:21-211:20, JA215:11-23, JA217:5-8, JA226:2-15, JA232:4-6, JA235:5-23, JA246:15-20, JA267:8-268:9, JA276:12-277:12.) At the time Justin fired, Roberts was just inside and at the threshold of the door, and Justin was just outside and at the threshold of the door. (JA196:8-14, JA210:21-211:9, JA285:18-21, JA473, JA604 ¶ 111, JA554 ¶ 111.)

Following discovery, Justin moved for summary judgment, asserting qualified immunity. The district court denied Justin's motion. Justin appeals from that erroneous ruling.

11

## SUMMARY OF ARGUMENT

Qualified immunity shields Justin from liability: His use of force was objectively reasonable. Further, Justin did not violate a clearly established right of Roberts, of which a reasonable officer would have known.

First, Justin's actions in firing his weapon were objectively reasonable. This is a pure question of law for the court to determine. Roberts attacked Corporal Fermin and Justin with a machete and presented a risk of serious injury or death. Justin acted as a reasonable and trained law enforcement officer would have acted under the circumstances. Justin's response to the threat of death or serious bodily injury that Roberts presented to Corporal Fermin and Justin was consistent with the actions of a reasonable and well-trained officer as well as generally accepted policies, practices, and training in law enforcement.

Second, Justin did not violate a clearly established constitutional right of Roberts of which a reasonable officer would have known. He did not cross a bright line when he fired his weapon defensively to prevent injury or death. Instead, Justin reasonably perceived, as did other Deputies on the scene, that Roberts presented an immediate and

potentially deadly threat to Corporal Fermin, Justin, and the other officers at the very moment Justin shot Roberts. Justin's and the other Deputies' reasonable perception that Roberts presented an immediate and potentially deadly threat to them is not subject to a court's substitution of its own after-the-fact perception or second guessing.

Finally, the discovery, including undisputed evidence, unchallenged expert analysis, Plaintiff's admissions, and uncontradicted testimony demonstrate that there are no unresolved factual issues that preclude Justin from prosecuting this appeal or prevent this Court from upholding Justin's qualified immunity. Rather, on this question of law that should be resolved as early as possible, all of these sources confirm, even in the peace of this Court's chambers, that Roberts was dangerous to himself or others and needed treatment, and when Roberts attempted to kill Corporal Fermin, Justin, and the other Deputies, he caused his own death.

## ARGUMENT

## I.    STANDARD OF REVIEW.

This Court reviews the district court's denial of qualified immunity *de novo*. *Durham v. Jones*, 737 F.3d 291, 298 (4th Cir. 2013). *See also*,

*Caraway v. City of Pineville*, 111 F.4th 369, 378 (4th Cir. 2024) ("We review *de novo* district court decisions on motions for summary judgment, [and] qualified immunity[.]") (internal quotation marks and citation omitted). *De novo* review shows that Justin is entitled to summary judgment based on qualified immunity.

Additionally, as discussed below, qualified immunity should be resolved as a question of law by the court, not by the jury. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); *Caraway*, 111 F.4th at 381. Although actual unresolved questions of material fact, as to which there are genuine issues, would be resolved by a jury, whether qualified immunity precludes liability is for the court. *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005).

When an officer asserts qualified immunity, a court considers, and this Court reviews *de novo*, two questions: (1) whether a constitutional or statutory violation occurred, and (2) if so, whether the right was clearly established at the time of the violation. *See Caraway*, 111 F.4th at 381 (describing qualified immunity analysis and quoting *Aleman v. City of Charlotte*, 80 F.4th 264, 284 (4th Cir. 2023)). If the answer to either

question is "no," the officer is entitled to qualified immunity.  111 F.4th at 381; 80 F.4th at 284.

## II. JUSTIN IS ENTITLED TO QUALIFIED IMMUNITY BECAUSE HE DID NOT VIOLATE ROBERTS'S CONSTITUTIONAL RIGHTS, AS HIS USE OF FORCE WAS OBJECTIVELY REASONABLE.

### A. CLAIMS OF EXCESSIVE FORCE ARE ANALYZED UNDER A REASONABLENESS STANDARD

In *Graham v. Connor*, 490 U.S. 389, 394-95 (1989), the Supreme Court specified that any claim "that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  490 U.S. at 395. In conducting the analysis, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  *Id*. at 396-97.

B.   JUSTIN'S ACTIONS WERE OBJECTIVELY REASONABLE
IN LIGHT OF THE FACTS AND CIRCUMSTANCES
CONFRONTING HIM.

Plaintiff contends that Justin violated Roberts's constitutional right to be free of excessive force by shooting Roberts. (JA14 ¶ 61; *see also* JA14 ¶¶ 59-60.) Fundamentally, Plaintiff's contention is stated at an impermissibly high level of generality that is contrary to the Supreme Court's jurisprudence and the centrality of qualified immunity in the use of force context. *See generally*, *Mullenix v. Luna*, 577 U.S. 7, 12–13 (2015) (State trooper who fatally shot vehicle driver in attempting to disable vehicle being used to flee from arrest did not violate clearly established law regarding excessive force under Fourth Amendment and was entitled to qualified immunity in § 1983 action brought by driver's estate; driver was approaching an officer who was manning spike strips that had been placed on freeway, thereby posing a risk to that officer).[3]

---

[3]   In *Mullenix,* the Supreme Court held that:

> This Court has previously considered -- and rejected -- almost that exact [high level] formulation of the qualified immunity question in the Fourth Amendment context.

16

There is no constitutional right to be free from deadly force when the conduct of the person subject to the officer's force imminently threatens the officer with death or severe injury. *Cf., Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996) (reversing district court's denial of summary judgment motion based on qualified immunity, and noting that "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences. And no court can expect any human being to remain passive in the face of an active threat on his or her life.").

---

     In *Brosseau,* which also involved the shooting of a suspect fleeing by car, the Ninth Circuit denied qualified immunity on the ground that the officer had violated the clearly established rule, set forth in *Tennessee v. Garner,* 471 U.S. 1 (1985), that "deadly force is only permissible where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Haugen v. Brosseau,* 339 F.3d 857, 873 (C.A.9 2003) (internal quotation marks omitted). This Court summarily reversed, holding that use of *Garner*'s "general" test for excessive force was "mistaken." *Brosseau,* 543 U.S. at 199. The correct inquiry, the Court explained, was whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the "'situation [she] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 199-200.

577 U.S. at 12–13 (cleaned up).

17

Correctly stated, the question, therefore, is whether Justin's actions were objectively reasonable in light of the facts and circumstances confronting him. *Graham*, 490 U.S. at 397. As noted above, this is a question of law for the court to decide: "Whether an officer's actions in firing his weapon were objectively reasonable is 'a pure question of law' for the court to determine." *Caraway*, 111 F.4th at 381 (quoting *Scott, supra*, 550 U.S. at 381 n.8 (2007)). In deciding this pure question of law, the reasonableness of the officer's actions must be judged "based on the circumstances confronting the officer immediately prior to and at the very moment he fired his weapon." 111 F.4th at 381 (quoting *Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019)). When analyzed at the level of specificity that the Supreme Court and this Court prescribe, the first qualified immunity question -- whether Justin violated a constitutional right of Roberts and is entitled to qualified immunity -- can only be resolved in favor of Justin.

"A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of **serious physical harm to the officer or others**." *Elliott*, 99 F.3d at 642 (emphasis added) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (holding not

constitutionally unreasonable for officer to use deadly force to prevent escape when officer has probable cause to believe suspect poses threat of serious physical harm to officer or others)).

In determining whether the alleged conduct constitutes excessive force in violation of the Fourth Amendment, a court must determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir.), *cert. denied*, 534 U.S. 949 (2001) (citing *Graham,* 490 U.S. at 395). Based on the facts of this case, every reasonable officer would have concluded that Roberts posed a threat warranting Justin firing his weapon.

In addition, a court may not weigh an officer's conduct through the lens of "20/20 hindsight" when evaluating reasonableness. 490 U.S. at 396. Rather, "a particular use of force must be judged from the perspective of a reasonable officer on the scene." *Id.* The exclusive focus of the inquiry should be on the information known to the officer or officers "'immediately prior to and at the very moment [they] fired the fatal shot.'" *Greenidge v. Ruffin,* 927 F.2d 789, 792 (4th Cir. 1991) ((quoting *Ford v. Childers,* 855 F.2d 1271, 1275 (7th Cir. 1988) (quoting, in turn, *Sherrod*

19

*v. Berry,* 856 F.2d 802, 805 (7th Cir. 1988))).  In this regard, "[t]he court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Elliott,* 99 F.3d at 642.

The familiar factors articulated in *Graham*, applied in *Caraway*, also apply in the present case to support the conclusion that Justin's actions were objectively reasonable.  Those factors are "[(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight."  *See Caraway* 111 F.4th at 382 (quoting *Graham*, 490 U.S. at 397) (numbering added by *Caraway*).  These factors demonstrate that Justin's actions were objectively reasonable, because Roberts, who was the subject of a court order commanding that he be taken into custody for mental health evaluation and treatment: (1) was armed and dangerous, (2) posed an immediate threat to the Deputies when he attempted to kill or severely injure them, and (3) actively resisted the mandate of the order and the Deputies' attempts to carry out the order.

As to the first factor, severity, Plaintiff admitted that Roberts was a danger to himself or others. (JA177, JA166:23-167:11.) Indeed, she informed Captain Parker that she was afraid Roberts would harm her and her children. (JA587 ¶ 53, JA594 ¶ 74, JA551-552 ¶¶ 53, 74.) In addition, Roberts had a history of violence including toward law enforcement. (JA257:3-8, JA298:16-299:2, JA303-304 ¶ 7, JA304 ¶10.)

With regard to the second *Graham* factor, "whether the suspect posed an immediate threat to the safety of the officers or others," *Caraway* noted that this factor is "particularly important." 111 F.4th at 382. When Roberts charged at Corporal Fermin and Justin, he posed an immediate and deadly threat to the Deputies' safety. (JA205:5-17, JA210:21-211:20, JA215:11-23, JA217:5-8, JA226:2-15, JA235:5-23, JA267:8-268:9, JA276:12-277:12.)

With respect to the third factor, resistance or evasion, Roberts refused to accept service of the IVC Order, rejected the assistance it and the Deputies offered, and defied this lawful court order entered for his own protection and that of others. (JA263:17-21, JA264:21-22, JA265:3-6.) Moreover, Roberts appeared to be preparing to attack the Deputies

(JA264:13-20), thereby satisfying this third factor as well as meeting the second factor's immediate threat requirement.

Roberts's actions before the fatal shots, including: (1) his rejection over a multiple-hour period to accept help; (2) his refusal to submit to the lawful authority of the IVC Order and allow the Deputies to carry out its mandate; (3) his increased aggressiveness over the 45-minute to one-hour time-frame that the Deputies attempted to reason with him and to persuade him to accept and receive help; (4) his aggressive and violent actions toward Corporal Fermin and Justin; (5) his attempt to kill Corporal Fermin, whom Justin was specifically tasked with protecting because of Corporal Fermin's vulnerability, and/or his attempt to kill Justin; all indisputably show that Justin's response to the threat that Roberts presented to the life of another Deputy and to Justin's life satisfied the *Graham* factors and was objectively reasonable.

John Ryan, a retired police captain who now serves as a law enforcement training and procedures expert, evaluated Justin's actions. Mr. Ryan is the co-director of the Legal and Liability Risk Management Institute, which provides training and operations reviews for law

22

enforcement agencies and jails throughout the United States.  (JA364 ¶ 1, JA365 ¶¶ 4-5, JA365-366 ¶ 7, JA367 ¶ 8.)  According to Mr. Ryan,

> [O]nce Roberts, armed with an edged weapon, charged toward [Justin] Evans and the stack of SRT officers, a reasonable and well-trained officer would recognize that in addition to the commitment order, Roberts was committing both a serious and extremely violent offense that posed the most dramatic physical threat to the officers, specifically a threat of serious bodily harm or death.
>
> . . .
>
> [A]ny reasonable and well-trained officer in the position of Evans would recognize that an advancing subject, armed with a machete posed an immediate threat of serious bodily harm or death and would recognize that the use of deadly force to stop the threat was consistent with generally accepted policies, practices, and training in law enforcement for deadly force decision-making.

(JA436 ¶ 48, JA438 ¶ 52.)  Plaintiff did not dispute Mr. Ryan's qualifications or opinions, offered no contrary expert or evidence, and did not even depose Mr. Ryan.  Consequently, Mr. Ryan's opinions were and are unchallenged and provide additional and compelling support for the conclusion that Justin's actions were objectively reasonable.

Under the circumstances, Justin unquestionably had "probable cause to believe that [Roberts] pose[d] a threat of serious physical harm to the officer or to others." *Tennessee v. Garner, supra,* 471 U.S. at 11.

23

The foregoing discussion demonstrates forcefully that the answer to the initial, threshold question of whether Justin used excessive force in violation of Roberts's constitutional rights is a resounding "No." Consequently, this Court, on that ground alone, should hold that Justin is entitled to qualified immunity.

## III. JUSTIN IS ENTITLED TO QUALIFIED IMMUNITY BECAUSE HE DID NOT VIOLATE A CLEARLY ESTABLISHED RIGHT OF ROBERTS OF WHICH A REASONABLE LAW ENFORCEMENT OFFICER WOULD HAVE KNOWN.

Qualified immunity protects law enforcement officers[4] from "civil liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). *See also*, *Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007) (stating,

---

[4]  As noted *supra*, determining whether to grant qualified immunity is a question of law for the court.  This determination should be made as early as possible to protect law enforcement officers from the burdens of litigation.  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

qualified immunity shields public officials "from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *Tarantino v. Bake*r, 825 F.2d 772, 774 (4th Cir. 1987) (same).

A right is "clearly established" if it would be clear to a reasonable officer that the conduct is unlawful. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In other words, the contours of the right must be "sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in the original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). To determine whether a right is clearly established, courts must assess whether the law has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998), *aff'd*, 526 U.S. 603 (1999) (citation omitted).

Admittedly, a right need not be recognized by a court in a specific factual context before such right may be considered "clearly established" for purposes of qualified immunity. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Buonocore v. Harris*, 65 F.3d 347, 356–57 (4th Cir. 1995).

However, and as noted in Part II.B above, the Supreme Court has emphasized that courts are "not to define clearly established law at a high level of generality," and that "[s]pecificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix supra,* 577 U.S. at 12 and *City and Cnty. of San Francisco v. Sheeran*, 575 U.S. 600, 613 (2015)). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.' That is a necessary part of the qualified-immunity standard . . . ." *Kisela* 584 U.S. at 105.

Consistent with the analysis applicable to the first question, which is whether a constitutional right has been violated and is discussed in Part II.B above, "[t]o determine whether a federal right was clearly established at the time of the defendants' alleged conduct, we focus 'not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged.'" *Jackson v. Long*, 102 F.3d 722, 728 (4th Cir. 1996). As also discussed in part I above, the initial, "threshold question" is whether "the facts alleged show that [the

public official's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). If the answer is no, as it is in this case, then "no further inquiry is required." *Id. See also Caraway, supra,* 111 F.4th at 381 (quoting *Aleman, supra*, 80 F.4th at 284, in stating that, if answer to question whether constitutional right is violated is no, then officer is entitled to qualified immunity).

"If, on the other hand, a constitutional right is deemed to have been violated, 'the next, sequential step is to ask whether the right was clearly established,' meaning that 'in the light of pre-existing law, the unlawfulness of [the] actions is apparent.'" *Id.* (quoting *Johnson,* 475 F.3d at 650). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Jackson*, 102 F.3d at 731 (citing *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992), *cert. denied,* 506 U.S. 1080 (1993)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Dunbar v. Lindsey*, 905 F.2d 754, 763 (4th Cir. 1990). Accordingly, unless a law enforcement officer's "act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the

law would have done such a thing, the [officer] has immunity from suit." *Lassiter v. Alabama A&M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994).

Even if Justin and the other Deputies had been mistaken about the deadly threat Roberts presented -- and they were not -- qualified immunity still applies because it "gives ample room for mistaken judgments." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). If reasonable public officials could disagree about the lawfulness of the officer's actions, the officer is entitled to qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (holding that, "a police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful.").

Law enforcement officers are not expected to remain passive in the face of an active threat. *Elliott*, *supra*, 99 F.3d at 644. Further, although officers must have a reason to believe the subject poses a serious threat to their safety or the safety of others, they are not required to be absolutely sure of the nature of the threat or the subject's intent. *Id.* It is well settled that an officer is entitled to qualified immunity if he uses deadly force against a subject who disregards commands and moves in a

way that suggests the subject is preparing to attack, even without a prior attempt to kill the officer. *See e.g., McLenagan v. Karnes*, 27 F.3d 1002, 1005-06 (4th Cir. 1994) (holding officer acted reasonably when he shot an apparently fleeing subject after fellow officer reported, "The man has got a gun"); *Slattery*, 939 F.2d 213, 214, 215, 216-17 (reversing denial of summary judgment because officer who shot subject who failed to comply with instructions to keep hands up and was holding object resembling a weapon was entitled to qualified immunity); *Reese v. Anderson*, 926 F.2d 494, 495, 501 (5th Cir. 1991) (reversing denial of summary judgment and holding qualified immunity applied to officer who fired when subject refused to keep his hands up and moved in manner that officer thought was grabbing a weapon).

Federal Courts have repeatedly held that the only question is whether an officer in such circumstances could have reasonably perceived a threat of serious physical harm or death to himself or others. Both Corporal Fermin and Justin thought they were the immediate target of Roberts's attack with a deadly weapon; their perception was confirmed by the attendant circumstances. (JA205:5-17, JA210:21-

29

211:20, JA215:11-23, JA217:5-8, JA226:2-15, JA246:15-20, JA267:8-268:9, JA276:12-277:12, JA285:18-21.)

Another CCSO Deputy saw Roberts attack Corporal Fermin and Justin. Corporal Phillip A. Hernandez ("Corporal Hernandez") also saw Roberts rapidly advancing toward Corporal Fermin and Justin with a machete raised over his head to attack. (JA235:5-23.)

In addition, Captain Parker saw the deadly threat. Captain Parker described what he saw -- and feared -- as follows:

> Q     Were you able to see Mr. Roberts once the door popped open?
>
> A     Yes, sir.
>
> Q     Okay, walk me through what you see from the door popping open?
>
> A     Again it was -- again, everything happened -- it's just what I told you just right before. He was aggressively going towards the front door. He grabbed -- like I said, he grabbed something, raised his arm up, and had his arm up while he was at the door, and everything just happened just so fast.
>
> Q     Were you able to see him when the shots were fired?
>
> A     All I remember -- I'll be honest with you. I just remember looking over -- over to my left to Deputy Evans because I feared something bad was getting ready to happen to him, honestly. So my attention went

30

straight to -- to him, and -- and I saw Deputy Evans. I mean, I remember -- I mean, I saw Deputy Evans. He -- he scooted back, scooted back, scooted back as far as he could. His -- I mean, to the point where even the butt of his rifle came off of his shoulder. You know, he was trying to -- he was trying to create a gap. And then I just heard the shots go off.

          . . .

          Q     So in any event, when Mr. Roberts charged the door with the object above his head, you said you were fearful. Why is that?

          A     Again, just with the distance and the way he was at the door, I was just fearful for Mr. Evans. Deputy Evans is right there at the front door. Again, my attention went straight to him because I thought he was definitely getting ready to have some serious injuries.

          Q     Were you able at the time he was approaching the door to tell exactly what the --

          A     Object.

          Q     -- object was that he had?

          A     I didn't have time.

          Q     Did you ultimately see what the object was?

          A     I did.

          Q     And what was the object he had in his hand?

          A     The machete.

Q    Did it appear to you that Deputy Ferman [sic] and Deputy Evans's lives were in danger at the time that those movements were made by Mr. Roberts?

A    Yes, and --

Q    That's all my questions.  I didn't mean to cut you off.  I'm sorry.

A    No, no; just, yes, sir, they were in danger, yes.

(JA267:11-268:9, JA276:12-277:12.)

Therefore, Justin's belief that Roberts presented an immediate and potentially deadly threat to Corporal Fermin, Justin, and the other Deputies at the very moment Justin shot Roberts, which belief was shared by at least three others -- Corporal Fermin, Corporal Hernandez, and Captain Parker, was reasonable.  (*Id.*)  *See Pollard v. City of Columbus, Ohio,* 780 F.3d 395, 403 (6th Cir. 2015), *cert. denied*, 577 U.S. 872 (2015) (that decedent was unarmed is beside the point; what matters is reasonableness of officer's belief) and *Wilson v. Meeks*, 52 F.3d 1547, 1553-54 (10th Cir. 1995) (officer entitled to qualified immunity; inquiry is not into the subject's state of mind or intentions, but whether, from objective standpoint officer reasonably feared for his life).  Moreover, because of Corporal Fermin's vulnerability as the breacher, Justin had

32

the specific added responsibility of protecting Corporal Fermin. (JA194:12-17, JA211:15-20, JA213:4-6, JA213:22-25, JA215:11-16, JA287:21-288:1.)  A reasonable officer is entitled to use deadly force "[w]here the officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) (quoting *Tennessee v. Garner*, 471 U.S. at 11).

Even in a case in which the record showed that officers caused the death, not because of a present attack, but when they merely saw a shotgun and commenced firing, thereby foreclosing summary judgment on qualified immunity grounds, this Court has explained that a law enforcement officer may use deadly force "when, based on a reasonable assessment, the officer or another person is threatened with the weapon." *Cooper*, 735 F.3d at 156, 159.  Indeed, as this Court has stated, "there are many circumstances under which a police officer could reasonably feel threatened," such that the use of deadly force would be permissible. *Id.* at 159 n.9.

Justin is also entitled to qualified immunity because there exists no pre-existing case law (or bright-line rule) that would demonstrate that he

33

violated any of Roberts's federally protected or constitutional rights under the circumstances confronting him.[5] For a right to be clearly established, it "must be sufficiently clear that **every** reasonable officer would [have understood] that what he is doing violated that right." *Reichle*, *supra*, 566 U.S. at 664 (emphasis added) (quoting *Ashcroft*, *supra*, 563 U.S. at 741). The "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. Plaintiff can point to no authority showing that Justin violated any of Roberts's clearly established rights. *See Wilson v. Layne*, *supra*, 141 F.3d at 114, 117, 118-19 (holding police officer entitled to qualified immunity when plaintiff could provide no cases of controlling authority at time of incident).

---

[5]  In this case,

> though a bright(ish) line emerges: [A]n officer may use deadly force when [s]he has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. Probable cause, in turn, exists when the facts and circumstances [are] sufficient to warrant a prudent officer in reaching that conclusion.

*Harris-Billups on behalf of Harris v. Anderson,* 61 F.4th 1298, 1302 (11th Cir. 2023) (cleaned up, with quotation marks and citations omitted).

Instead, and as set forth above, it is well-established that an officer who shoots a suspect who has used a weapon in an effort to attack, presenting a danger of death or serious injury to the officer, is protected by qualified immunity.[6]  Because Justin was trained to and acted in compliance with this well-established precedent (JA436 ¶ 48, JA438 ¶ 52), he is entitled to this protection against civil liability.

Therefore, this Court should hold that Justin is entitled to qualified immunity on the additional ground that he did not violate a clearly established right of Roberts of which a reasonable officer would have known.

## IV.    THERE WERE NO UNRESOLVED FACTUAL ISSUES THAT PRECLUDE THIS APPEAL OR QUALIFIED IMMUNITY.

As stated above, determining whether to grant qualified immunity is a question of law for the court.  *Caraway*, *supra*, 111 F.4th at 381; *Willingham*,

---

[6]  *See Franklin v. Popovich*, 111 F.4th 1188 (11th Cir. 2024) (holding mere fact that arrestee was unarmed did not create an issue of material fact as to whether law enforcement officer knew that arrestee was unarmed when officer fatally shot arrestee, who had made a sudden movement with his hand, so as to preclude summary judgment for officer on qualified immunity grounds on § 1983 claim alleging excessive force; no indication that officer knew that arrestee had dropped his weapon, and officer had no way of knowing whether arrestee had another weapon).

*supra*, 412 F.3d at 560 (stating qualified immunity is question of law to be resolved by the court, not the jury).  Moreover, this determination should be made as early as possible to protect law enforcement officers from the burdens of litigation.  *Hunter*, *supra*, 502 U.S. at 228.

Although unresolved factual issues, if any, are to be decided by the jury, the question of whether qualified immunity precludes liability is for the court.  *Willingham*, 412 F.3d at 560.  In the case *sub judice*, there are no unresolved factual issues that are material to qualified immunity.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment [premised on qualified immunity]; the requirement is that there be no genuine issue of material fact." *Scott, supra,* 550 U.S. at 380 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)).

During discovery, Plaintiff admitted four fundamental facts that entitle Justin to qualified immunity: (1) Roberts was dangerous to himself or others (JA177, JA165:11-19, JA166:16-18, JA167:100); (2) Roberts was in need of treatment (*id.*);[7] (3) Roberts attempted to kill

---

[7] Plaintiff testified, then affirmed, and then reaffirmed that Roberts was dangerous to himself and others and in need of treatment. (JA177, JA165:11-19, JA166:16-18, JA167:100.)

Corporal Fermin, Justin, and the other Deputies (JA179, JA174:10-14); and (4) by attempting to kill or seriously injure the officers, Roberts caused his own death (*id.*).

Through the applicable process of ascertaining undisputed material facts,[8] Plaintiff admitted the following additional facts:

o Captain Parker read to the SRT Deputies the IVC order and the supporting IVC petition, sworn to and signed by Plaintiff, before they attempted to make entry.  (JA594 ¶ 73, JA552 ¶ 73.)  The IVC Order and the IVC Petition stated that Roberts "was arming himself with throwing knives, mace, and a machete."  (*Id.*)

o Captain Parker informed the SRT Deputies before they attempted to make entry that Plaintiff said she was afraid of Roberts, that Roberts had made threats against her and her

---

[8]  In addition to the tacit admission inherent in the failure to controvert fact, the Local Civil Rules of Practice and Procedure for the Eastern District of North Carolina require a party moving for summary judgment to submit a statement, in numbered paragraphs, of material facts the movant contends are not in dispute.  E.D.N.C. Loc. Civ. R. 56.1(a)(1) (2023).  The opposing party must respond to each numbered paragraph.  *Id.* at 56.1(a)(2).  Any such facts that the opposing party does not specifically controvert are deemed admitted.  *Id.*  As the Joint Appendix citations in this brief show, Plaintiff not only tacitly, but expressly, admitted the facts presented here.

children, that she was afraid he would harm her and her children, and that Roberts believed the neighborhood children were agents and assassins hired by the SBI. (JA587 ¶ 53, JA594 ¶ 74, JA551-552 ¶¶ 53, 74.)

o Before the SRT Deputies attempted to make entry, Deputy Doody and Deputy Jones, along with Captain Parker, approached the same window from which Roberts yelled at Ms. Bethea (the mobile crisis intervention worker), Deputy Doody and Deputy Jones that morning. (JA598 ¶ 84, JA552 ¶ 84.)

o Captain Parker explained to Roberts that he and Deputies Doody and Jones were there for a wellness check and to help Roberts. (JA598 ¶ 85, JA552 ¶ 85.) Captain Parker asked Roberts to come outside and talk with them. (*Id.*)

o Roberts became irate, refused to come outside and talk to them, and ordered them to leave. (JA598 ¶ 86, JA552 ¶ 86.)

o Captain Parker told Roberts they had an order that they needed to serve on him, and asked him to come outside and get it taken

care of.  (JA600 ¶ 92, JA552 ¶ 92.)  Captain Parker also told Roberts that everything would be fine.  (*Id*.)

o Roberts again refused to come outside, and at that point, he became even more agitated.  (JA600 ¶ 93, JA552 ¶ 93.)

o Captain Parker saw and described the grave danger that Justin faced when the door was forced open.  "I just remember looking over -- over to my left to Deputy Evans because I feared something bad was getting ready to happen to him, honestly." (JA602 ¶ 102, JA553 ¶ 102.)

o Justin discharged his weapon from outside the door, at the threshold.  (JA604 ¶ 111, JA554 ¶ 111.)

o Justin estimates the time from when the door was opened to the time when he discharged his weapon to be nearly immediate -- less than two seconds.  (JA605 ¶ 112, JA554 ¶ 112.)

o Others, including SRT Deputies, likewise estimate the time from when the door was opened until Justin discharged his weapon to be nearly immediate.  (JA605 ¶ 113, JA554 ¶ 113.)

o After Justin discharged his weapon, Roberts fell backwards, landing on his back and side.  (JA607-608 ¶ 117, JA555 ¶ 117.)

○ Two machetes were found next to Roberts's body. (JA609 ¶ 122, JA555 ¶ 122.)

In addition to the foregoing and other admissions confirming that Justin fired in response to Roberts's machete attack, Barbara Wolf, M.D., a forensic pathologist who has performed more than 10,000 autopsies, provided the following expert analysis:

> The locations of the two bullet defects identified in the kitchen are consistent with Cpl. Evans firing forward from the area of the front door. The location of the casings indicate that the ejection port of Cpl. Evans' rifle was outside the door when the shots were fired. The fact that Mr. Roberts raised the machete over his head would have positioned his body slightly turned toward his right, exposing his left side to the muzzle of Cpl. Evans gun. When a body receives multiple gunshot wounds, the body will move depending on the trajectory and force of impact of the projectiles. In this case, the direction of the paths of all three gunshot wounds was from left to right, indicating that Mr. Roberts turned further to his right as this body was struck by the bullets. It is therefore further my opinion that the autopsy and scene findings are consistent with the descriptions of the incident given by Cpl. Evans and other deputies.

(JA473-474.) Plaintiff did not dispute Dr. Wolf's qualifications or opinions, offered no contrary expert or evidence, and did not even depose Dr. Wolf. Consequently, Dr. Wolf's opinions were and are unchallenged.

Plaintiff also corroborated Justin's description of Roberts rapidly advancing with a machete raised over his head, as well as Dr. Wolf's affirmation of Justin's description. First, Plaintiff admitted that, when Justin shot from outside the door, Roberts fell backwards, landing on his back and side. (JA607-608 ¶ 117, JA555 ¶ 117.) This confirms that Roberts was facing toward -- not away from -- Justin when Justin fired. In addition, Plaintiff admitted that two machetes were found next to Roberts's body. (JA609 ¶ 122, JA555 ¶ 122.)

Indeed, no witness contradicted Justin's, Corporal Fermin's, Corporal Hernandez's, and Captain Parker's description of Roberts rapidly advancing with an object raised over his head to attack, which Justin, Corporal Fermin, Corporal Hernandez immediately recognized as a machete, and Captain Parker subsequently identified as a machete. (JA205:5-11, JA208:12-20. JA209:11-13, JA211:7-12, JA215:19-23, JA215:4-9, JA235:5-23, JA276:12-277:4.)

In *Waller v. City of Danville*, 212 Fed. Appx. 162 (4th Cir. 2006), the district court granted summary judgment on an excessive force claim and this Court affirmed, holding that "the use of deadly force by [officers] was

41

objectively reasonable . . . in light of the facts and circumstances presented to [them] at the time." *Waller*, 212 Fed. Appx. at 171.

In *Waller*, when Danville, Virginia police officers arrived at Rennie Hunt's apartment in response to a 911 call from a neighbor, neither Hunt, who suffered from mental illness, nor his girlfriend, Virginia Evans, had been seen in the several days.  Officers learned that Hunt's neighbor as well as friends and family expressed concern about Evans's well-being. *Id*. at 170.  While officers were attempting to determine whether Evans had been harmed, Evans spoke from inside the apartment, and told police that Hunt, who had recently been arrested for domestic assault against Evans, refused to let her come to the door.  *Id*. at 169-70.  Although Evans initially told the officers that she was all right, she soon ceased to respond to the officers' attempts to contact her in order to ensure that she was safe.  *Id*.

The mentally-ill Hunt made statements which gave the officers "reasonable grounds to believe that he had a weapon and was willing to use it," telling one officer "[i]f you come in here, I've got something for you," and threatening to "blow [the] g---damned head off" of another.  *Id*. at 170.

42

Police officials decided to deploy the City's Emergency Response Team to the apartment. After repeatedly identifying themselves and stating that they had a warrant for Hunt's arrest, members of the team made a forced entry into the apartment. *Id.* "Hunt immediately charged at the agents with what they reasonably **perceived** to be a sickle-type rod or pipe and a screwdriver which the officers **perceived** to be a knife." *Id.* (emphasis added). This Court held that under these circumstances, the officers' use of deadly force was reasonable because "a reasonable officer would have believed that Hunt had a weapon (including a gun and probably a knife), that he was holding Evans against her will and refusing to allow her free movement, and that he was an immediate threat to the officers and to Evans." *Id.* at 170.

In *Anderson v. Russell*, *supra*, 247 F.3d at 131, this Court set aside a jury verdict in favor of a plaintiff on the issue of excessive force based on the fact that the defendant officer's use of force was reasonable to protect himself against a **perceived** threat. *Id.* at 130. Anderson was subdued and unarmed when he was shot three times because the officer mistakenly believed Anderson was reaching for a gun when in fact he was reaching to turn down the volume of his portable radio. *Id.* at 130-32.

Further, as the district court noted, Anderson initially appeared to have complied with commands to raise his hands but then quickly reached for his left pocket. *Id*. Plaintiff argued that issues of fact existed regarding the positioning of Anderson's hands and how quickly he was lowering his hands when he was shot. *Id*. This Court found that any discrepancies on these issues did not raise genuine issues of material fact and did not raise an issue of triable fact. *Id*.

Similarly, in *Sigman v. Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998), plaintiff's son was intoxicated, agitated, and threatening to kill himself. One of the responding officers shot and killed Sigman because he believed Sigman was holding a knife in a threatening manner. *Id*. at 785. This Court emphasized the immateriality of factual questions that exist outside the context of the officers' **perception** and noted that "a police officer need not, in all circumstances, 'actually detect the presence of an object in a suspect's hands before firing on him.'" *Id*. at 788. This Court deemed factual issues raised by plaintiff, including the distance between decedent and the officer and whether decedent was armed, to be immaterial. *Id*.

44

This Court's decisions in *Waller*, *Anderson*, and *Sigman* demonstrate that courts, in the peace of their chambers and under circumstances that are by no means tense, uncertain, or rapidly evolving, may not substitute their **perceptions**, for the **perceptions** of the officers on the scene who are reacting to real events confronting them in real time. *See Waller*, 212 Fed. Appx. at 170 (stating subject charged officers with what they perceived to be a dangerous weapon); *Anderson*, 247 F.3d at 130 (officers perceived subject to be armed with a gun); *Sigman*, 161 F.3d at 786 (officer perceived subject to be attacking with a knife).

**Indeed, in the proper application of qualified immunity in claims of excessive force, this Court refuses to substitute after-the-fact judicial perceptions for those of officers, despite evidentiary discrepancies.** *See Anderson*, 247 F.3d at 130 (holding "[Officer] Russell reasonably perceived [subject] Anderson to be armed with a gun" despite discrepancies in evidence relation to subject's movements."); *Sigman*, 161 F.3d at 787-88 (emphasizing immateriality of factual questions such as whether subject actually had a knife and

distance between subject and officer existing outside context of the officers' perception).

Finally, and in a further refusal to second guess an officer's belief as to the threat he confronted, this Court, in *Slattery*, reversed the denial of an officer's summary judgment motion despite the determination, after the plaintiff was shot in the face, that the plaintiff was not armed with a weapon. *Id*. at 215-16. The officer testified that he was not able to see the plaintiff's hands and it appeared to him that the plaintiff was coming toward him with a weapon, when he was actually holding a beer bottle. *Id*. at 215-16.

## <u>CONCLUSION</u>

Roberts attempted to kill or seriously injure Corporal Fermin, Justin, and the other Deputies, causing Justin to respond by firing his weapon to neutralize the deadly threat Roberts created. Justin's response was objectively reasonable, in that he acted in accordance with generally accepted policies, practices, and training in law enforcement and consistent with the actions of a reasonable and well-trained officer. In addition, Justin's perception that Roberts presented a threat of death or serious physical harm to Corporal Fermin, Justin, and the other

46

Deputies was reasonable and shared by at least three other Deputies --
Corporal Fermin, Corporal Hernandez, and Captain Parker. This
reasonable perception entitles Justin to qualified immunity. Finally, the
admitted or otherwise unchallenged facts also show that Roberts, by
attacking and attempting to kill Corporal Fermin, Justin, and the other
Deputies, caused his own death.

Accordingly, summary judgment is mandated here, where the
uncontradicted facts show that Justin, who was facing a mentally ill man,
Roberts, whom the Deputies were attempting to take into custody
pursuant to a court order finding that Roberts was a danger to himself
and others, and whom Justin, Corporal Fermin, and other Deputies saw
and knew to be armed with machetes and knives and was in the act of
attempting to use a machete against the Deputies. In these tense,
uncertain, and rapidly evolving circumstances, the district court erred in
denying Justin's motion for summary judgment, premised on qualified
immunity, from an excessive force claim under 42 U.S.C. § 1983.

In conclusion, Defendant-Appellant Deputy Justin Evans requests
that the Court reverse the district court's denial of summary judgment

47

for Justin and remand for entry of summary judgment in his favor based

on qualified immunity.

Respectfully submitted, this the 15th day of May, 2025.

WILSON RATLEDGE, PLLC

By: */s/ Reginald B. Gillespie, Jr.*
    Reginald B. Gillespie, Jr.
    WILSON RATLEDGE, PLLC
    4600 Marriott Drive
    Suite 400
    Raleigh, NC 27612
    (919) 787-7711

    *Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

This document contains <u>9,407</u> words.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using Microsoft Word in <u>14-point Century Schoolbook</u>

Respectfully submitted, this the 15th day of May, 2025.

WILSON RATLEDGE, PLLC

By: <u>*/s/ Reginald B. Gillespie, Jr.*</u>
     Reginald B. Gillespie, Jr.
     WILSON RATLEDGE, PLLC
     4600 Marriott Drive
     Suite 400
     Raleigh, NC  27612
     (919) 787-7711

*Counsel for Appellant*

49